ORIGINAL.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------X

IN RE TOWER AUTOMOTIVE
SECURITIES LITIGATION,

~ 94566

05 Civ. 1926 (RWS)

O P I N I O N

--------------------------------------X

A P P E A R A N C E S :

Attorneys for Plaintiffs

VIANALE & VIANALE, LLP
2499 Glades Road, Suite 112
Boca Raton, FL 33431
By: KENNETH VIANALE, ESQ.

Attorneys for Defendant

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
By: ROBERT KRAVITZ, ESQ.

Sweet, D.J.

Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the
Private Securities Litigation Reform Act ("PSLRA"), defendants
Anthony A. Barone ("Barone"), Dugald K. Campbell ("Campbell"),

Returned to chambers for scanning on: 4.20.07
Scanned by chambers on 4|24|07

Christopher Hatto ("Hatto"), S.A. Johnson ("Johnson"), Kathleen Ligocki ("Ligocki"), James A. Mallak ("Mallak"), Scott D. Rued ("Rued"), and Ernest T. Thomas ("Thomas"), collectively "Defendants," have moved to dismiss the Consolidated Amended Class Action Complaint ("the Complaint") filed by lead plaintiffs Nathan F. Brand, Dorothea C. Brand, Tombstone Limited Partnership, Frederic E. Mohs, and Paula A. Mohs ("The Brand Group" or "Plaintiffs") individually and on behalf of all others similarly situated.

For the reasons set forth below, Defendants' motion to dismiss the Complaint is granted in part and denied in part.

## Prior Proceedings

This action was initiated on or about February 4, 2005. By order dated May 24, 2005, related actions were consolidated with the first-filed case, lead plaintiffs were appointed, and lead plaintiffs' choice of lead counsel was approved. On September 30, 2005, Plaintiffs filed the Consolidated Amended Class Action Complaint ("the Complaint"). On September 27, 2006, Defendants' motion to dismiss the Complaint pursuant to Fed. R.

Civ. P. 9(b) and 12(b)(6), which had been filed on January 19, 2006, was heard and marked as fully submitted.


## The Parties[1]


The Plaintiffs purchased Tower Automotive, Inc. ("Tower") securities during the period December 21, 2000 to February 1, 2005, inclusive (the "Class Period").


Defendant Hidden Creek Industries, Inc. ("Hidden Creek") is a corporation formed by Johnson which acquired Tower in 1993 and was paid fees for advising on subsequent acquisitions by Tower.   Hidden Creek lists its headquarters as 80 S. 8th Street, 4508 IDS Center, Minneapolis, MN.


Defendant J2R Partners ("J2R") is a limited partnership which managed Hidden Creek.   Among J2R's partners were Johnson and Rued.   J2R lists its address as 4508 IDS Center, Minneapolis, MN.

---

[1] The following descriptions are drawn from the Complaint and do not constitute the findings of the Court.

Campbell was President, Chief Executive Officer, and a member of the Executive Committee of Tower from the beginning of the Class Period until his retirement on July 29, 2003. Campbell also served as a consultant to Hidden Creek.

Thomas was Chief Financial Officer of Tower from the beginning of the Class Period until his resignation on August 13, 2003.

Ligocki was President and Chief Executive Officer of Tower from July 29, 2003 until the end of the Class Period.

Mallak was Chief Financial Officer of Tower from January 5, 2004 until the end of the Class Period.

Johnson was Chairman, Director, and a member of the Executive Committee of Tower for the duration of the Class Period. Johnson was also Chief Executive Officer of Hidden Creek from 1989 to May 2001, and the Chairman of Hidden Creek from May 2001 until the close of the Class Period.

Rued was Vice President, Director, and a member of the Executive Committee of Tower from the beginning of the Class

4

Period until May 8, 2003. From 1994 to May 2001, Rued was Executive Vice President and Chief Financial Officer of Hidden Creek. Since May 2001, Rued has been Chief Executive Officer and President of Hidden Creek.

Barone was Vice President, Chief Financial Officer, and Treasurer of Tower from the beginning of the Class Period until October 2002. Barone remained an employee of Tower until May 31, 2003

Hatto was Controller of Tower from Spring 2004 until the end of the Class Period and reported to Mallak.

**The Action**

This is a securities fraud class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

The Complaint alleged that Defendants failed to disclose and misrepresented material information regarding: (1) Tower's lack of success in integrating the various companies that it acquired before and during the Class Period; (2) arrangements

5

by which Tower was paid on an express schedule by its largest U.S. customers; (3) the terms of Tower's long-term supply contracts with its largest U.S. customers; (4) Tower's accounts payable practices; and (5) planning and decisions leading up to Tower's bankruptcy filing.

As a result of these allegedly false statements and omissions, Tower hid its true financial condition, lack of liquidity and exposure to bankruptcy, and its stock price was artificially inflated.  That stock price later fell when the truth was revealed, allegedly causing economic losses to Plaintiffs and other class members.

Count One of the Complaint alleges that all defendants except Hidden Creek and J2R thereby violated Section 10(b) of the Exchange Act, see 15 U.S.C. § 78t et seq., and Rule 10b-5 promulgated thereunder.  See 17 C.F.R. § 240.10b-5.

Count Two of the Complaint alleges that defendants Johnson, Rued, Hidden Creek and J2R thereby violated Section 10(b) of the Exchange Act and Rule 10b-5 (a) & (c) promulgated thereunder.

Count Three of the Complaint alleges that all defendants except J2R violated Section 20(a) of the Exchange Act by exercising control over Tower.  See 15 U.S.C. § 78t(a).

## Background[2]

Tower, a supplier of automotive parts, was formed in April 1993 with the purchase of several companies that supplied auto components to large automakers, or original equipment manufacturers ("OEMs").  In 1993 Tower's revenues were just $86 million, but the company grew enormously during the 1990s by acquiring -- or "rolling up" -- another 14 OEM suppliers.  In 2000, Tower reported $2.5 billion in revenues.  Many of the companies Tower acquired during this period had long-term contracts with the OEMs, some of which required annual price decreases to the automakers.

These pricing pressures coupled with a downturn in the economy and auto industry in particular to create cash flow problems for Tower.  In 2001, the company began to "factor" its account receivables -- that is, Tower sold its right of

---

[2] The following facts are drawn from the Complaint and do not constitute findings of the Court.

collection to a third party at a discount in exchange for faster payment. When the OEMs eventually ended their participation in such programs in 2004, Tower's liquidity problems reached crisis level, ultimately forcing the company to file for bankruptcy protection on February 2, 2005.

Another manifestation of Tower's financial difficulties was its accounts payable practices. In 2001 or 2002 (the Complaint is not clear on this point), Tower began to push back the time it would take to pay its vendors. As the company's liquidity troubles deepened, Tower stopped paying some suppliers to some of its plants altogether, and a large number of suppliers refused to extend Tower credit.

## Discussion

I. Count One: Plaintiffs' 10b-5(b) Claim

Count One of the Complaint asserts that defendants Campbell, Thomas, Ligocki, Mallak, Barone, Johnson, Rued, and Hatto violated Section 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) provides in pertinent part as follows:

8

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b-5 provides in pertinent part as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

. . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .

17 C.F.R. § 240.10b-5.

"The language of Section 10(b) and Rule 10b-5 does not explicitly create a private right of action. In fact, the

9

legislative history fails to indicate whether Congress even contemplated creating such a right . . . . Nevertheless, courts long have held that a private right of action was indeed created." Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27, 31 (2d Cir. 2004).

To state a cause of action under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must plead the following elements: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . .; (5) economic loss; and (6) loss causation, i.e., the causal connection between the material misrepresentation and the loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (internal citations and quotation marks omitted); see also In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 213 (S.D.N.Y. 1999).

An omitted fact is material if there is a "substantial likelihood that [its disclosure] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." TSC Industries, Inc. v. Northway, 426 U.S. 438, 449 (1976) (internal quotation marks

10

omitted).    Materiality is generally a matter for the finder of
fact, and should be decided on a motion to dismiss only when
"reasonable minds could not differ" on the importance of the
misrepresentation "to a reasonable investor." Ganino v. Citizens
Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (quoting Goldman v.
Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

## A. Standards under Fed.R.Civ.P 9(b) and the PSLRA

Defendants have moved for dismissal of the Complaint
pursuant to Fed.R.Civ.P.  12(b)(6),  9(b),  and the  PSLRA.   In
considering a motion to dismiss pursuant to Rule 12(b)(6), the
Court construes the complaint liberally, "accepting all factual
allegations in the complaint as true, and drawing all reasonable
inferences in the plaintiff's favor." Chambers v. Time Warner,
Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citing Gregory v. Daly,
243 F.3d 687, 691 (2d Cir. 2001)).

However, "mere conclusions of law or unwarranted
deductions" need not be accepted.    First Nationwide Bank v. Gelt
Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994).   Furthermore, the
truth of factual allegations that are contradicted by documents
properly considered on a motion to dismiss need not be accepted.

11

See, e.g., Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). The following materials may be considered on a Rule 12(b)(6) motion:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

> In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (footnotes omitted).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004) (quoting Geisler v. Petrocelli,

616 F.2d 636, 639 (2d Cir. 1980)).  Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."  <u>Sweet v. Sheahan</u>, 235 F.3d 80, 83 (2d Cir. 2000); <u>accord</u> <u>Eternity Global Master Fund</u>, 375 F.3d at 176-77.

A claim under section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule 9(b), Fed.R.Civ.P.  <u>See</u>, <u>e.g.</u>, <u>In re Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63, 69-70 (2d Cir. 2001).  Such a claim must also satisfy certain requirements of the PSLRA.  <u>See</u> 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(2); <u>see</u> <u>generally</u> <u>Novak v. Kasaks</u>, 216 F.3d 300, 306-07 (2d Cir. 2000) (setting forth the heightened pleading standards of the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b-5); <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1127 (2d Cir. 1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule 10b-5 are subject to the pleading requirements of Rule 9(b)").

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other

condition of mind of a person may be averred generally."
Fed.R.Civ.P. 9(b).   The Second Circuit "has read Rule 9(b) to
require that a complaint [alleging fraud] '(1) specify the
statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statements
were made, and (4) explain why the statements were fraudulent.'"
Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills
v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).


     Similarly, the PSLRA imposes the requirements that
allegations of misleading statements or material omission must
"specify each statement alleged to have been misleading, the
reason or reasons why the statement is misleading, and, if an
allegation regarding the statement or omission is made on
information and belief, the complaint shall state with
particularity all facts on which that belief is formed."   15
U.S.C. § 78u-4(b)(1); see Rombach, 355 F.3d at 170.


     Rule 8's general pleading requirement and Rule 9(b)'s
particularity requirement must be read together.   See Ouaknine v.
MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990) (stating that "Rule
9(b) . . . must be read together with Rule 8(a) which requires
only a 'short and plain statement' of the claims for relief");

14

Credit & Fin. Corp. v. Warner & Swasey Co., 638 F.2d 563, 566 (2d Cir. 1981) (same); In re Initial Pub. Offering Sec. Litig. ("IPO"), 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003). These two rules have been read together to mean that a plaintiff need not plead evidentiary details. See, e.g., IPO, 241 F. Supp. 2d at 327. The Second Circuit has stated that it does "not require the pleading of detailed evidentiary matter in securities litigation." Scholastic, 252 F.3d 63, 72.[3] Courts of this district have stated that "the application of Rule 9(b) . . . must not abrogate the concept of notice pleading." IPO, 241 F. Supp. 2d at 327 n.46.

## B. Requirement of scienter under 10b-5

The scienter requirement is long-standing, but Congress more clearly defined it in 1995 with passage of the PSLRA. See Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5). A primary impetus for the law was the desire to deter "strike suits wherein

---

See also Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1225 (1st Cir. 1996) (stating that "in determining the adequacy of a complaint under [Rule 9(b)], we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence").

15

opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." <u>Novak</u>, 216 F.3d at 306. Congress viewed the PSLRA's scienter requirement as a bulwark against abuse of the securities litigation process, including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer." H.R. Conf. Rep. No. 104-369, at 31 (1995) reprinted in 1995 U.S.C.C.A.N. 730, 730.

Scienter is established if plaintiff establishes facts that "give rise to a strong inference of fraudulent intent." <u>Novak</u>, 216 F.3d at 307. The Second Circuit has stated that this scienter requirement can be satisfied "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138-39 (2d Cir. 2001).

Courts should consider the entire complaint when determining if scienter has been adequately pleaded. <u>See</u> <u>In re Philip Servs. Corp. Secs. Litig.</u>, 383 F. Supp. 2d 463, 474-76

(S.D.N.Y. 2004). It is still appropriate, however, to examine each claim (i.e., each group of related statements and/or omissions) individually, since even a full constellation of allegations may prove insufficient to establish scienter for particular statements and/or certain defendants.

## C. Sufficiency of Count I allegations under Rule 9(b), PSLRA, and 10-b(5)

i. Alleged misstatements and omissions concerning 'integration'

Plaintiffs allege that the following disclosures concerning Tower's integration of its myriad acquisitions constituted material misstatements under the meaning of Rule 10b-5:

> We possess a strong track record of accretive acquisitions and have proven our consolidation abilities by successfully integrating multiple acquisitions and extracting significant cost savings and synergies. (12/21/00 S-4/A Statement, Am. No. 3, at 45; 1/9/01 424B3 Statement, at 43; Compl. ¶¶ 98-99).

> Since our inception in April 1993, our revenues and earnings before interest, taxes and depreciation and amortization, or EBIDTA, have grown rapidly through a

17

focused strategy of internal growth and a highly disciplined acquisition program. We have successfully completed 14 acquisitions and established joint ventures in China, Mexico, Korea, Japan and the United States. (9/21/01 S-3 Statement; 11/6/01 S-3/A Statement; 11/28/01 S-3/A Statement; 12/21/01 S-3/A Statement; 3/25/02 10-K405 Statement for 2001; 3/19/03 10-K Statement for 2002; 3/8/04 10-K Statement for 2003; Compl. ¶¶ 101-02).

Dug Campbell has been instrumental over the past 10 years in growing a small regional stamping supplier into the largest automotive metal structures company in the world. His commitment to building a values-based enterprise was total, as this culture became a key ingredient in the integration of 17 acquisitions and partnerships worldwide. Dug will be working with Kathleen Ligocki over the next few months in this positive transition of leadership responsibilities. (Press Release, Tower Automotive Investor Relations, "Kathleen Ligocki Named President and CEO of Tower Automotive; Dug Campbell Finalizes Retirement Plans," (Jul. 28, 2003) (available at: http://www.towerautomotive.com/releases/2003/072803.htm ); Compl. ¶ 104).

Mere "expressions of puffery and corporate optimism do not give rise to securities violations." Rombach, 355 F.3d at 174. The hallmark of such statements is that they are not capable of objective verification. Vague and non-specific pronouncements on the success of integrating acquisitions are inactionable puffery. See In re Razorfish, Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 14756 at *5 (S.D.N.Y. Sept. 21, 2001) ("'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud in this context."); San

18

Leandro Emergency Medical Group Profit Sharing Plan v. Philip
Morris Cos., Inc., 75 F.3d 801, 811 (2d Cir. 1996) ("Such puffery
cannot have misled a reasonable investor . . . .").

Except for Tower's claim that it had "extract[ed]
significant cost savings and synergies" from its acquisitions
(which shall be taken up below), all of the language Plaintiffs
cite concerning the successfulness of its acquisitions and their
integration into Tower falls short of the sort of concrete,
verifiable (or falsifiable) statements that can be the subject of
a 10b-5 claim. See Razorfish, 2001 U.S. Dist. LEXIS 14756 at *5;
San Leandro Emergency Medical Group, 75 F.3d at 811.

Plaintiffs' reliance on In re NTL Inc. Sec. Litig., 347
F. Supp. 2d 15 (S.D.N.Y. 2004) is unfounded. In NTL, the court
found that *material* statements or omissions regarding integration
of corporate acquisitions could be actionable. See id. at 27.
While determination of materiality is typically a fact-intensive
endeavor ill-suited for resolution on a motion to dismiss, cite,
rhetorical puffer statements by their very nature are immaterial.
See San Leandro Emergency Medical Group, 75 F.3d at 811. By
imposing the materiality requirement Congress has implicitly
declared that it trusts those willing to brave the vicissitudes

19

of the market and invest in publicly-held companies to disregard corporate braggadocio utterly lacking in substance. Tower's nebulous and unmeasurable claims of "success" in integrating its acquisitions are just the sort of statements not properly the subject of a securities fraud claim.

In contrast, the Tower's statement that it had "extract[ed] significant cost savings and synergies" from its acquisitions (made in forms filed on 12/20/00 and 1/9/01) is potentially capable of measurement and verification, and thus not dismissible as puffery. See San Leandro Emergency Medical Group, 75 F.3d at 811.

Still, under the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA, Plaintiffs must allege with specificity the basis for its claim that the statement is false or misleading. See Rombach, 355 F.3d at 170. Plaintiffs have met this burden. To support their allegation, Plaintiffs cited the following statements attributed to CEO Kathleen Ligocki:

> [T]he "culture of decentralization has prevented Tower from really leveraging economies of scale. . . . Insufficient focus was given to post merger integration . . . ." (Compl. ¶ 39).

20

> Tower, Ligocki said, also didn't do the streamlining it should have as it bought various companies . . . . 'This company had been run where each plant acted like its own \$100-million to \$300-million unit,' she said. 'All plants should have been integrated earlier as they were bought.'   (Compl. ¶ 40).

Additionally, the Complaint alleges that a confidential witness who worked as a Senior Internal Auditor and Information Technology Auditor in Tower's Internal Audit Office at Tower's headquarters from February 2003 to June 2004 ("CW-1") stated that the acquired plants "operated as individual 'mom and pop' businesses."   (Compl. ¶ 42).

Each of these statements tends to support Plaintiffs' averment that Tower did not in fact gain cost savings or achieve synergies from its various acquisitions.   See Novak, 216 F.3d at 312-13.   Taken together and viewed in the light most favorable to Plaintiffs, these supporting statements form a sufficient basis for Plaintiff's belief that Tower's statement was fraudulent: if in fact each acquired plant acted as its own independent business, doubt is cast on the truth of Tower's claimed synergies.[4]

---
[4]

Defendants argue that decentralization was Tower's strategy all along, only changing when Ms. Ligocki became CEO.   (See

The Complaint provides a sufficient basis for scienter. Plaintiffs allege that Defendants "knew facts or had access to information suggesting" that Tower had not in fact achieved significant cost savings or synergies through its acquisitions. Novak, 216 F.3d at 311. Specifically, Ligocki's comments upon becoming CEO and after Tower's bankruptcy filing provided some evidence that Tower executives knew or should have known that Tower had not achieved the claimed cost savings, despite coming more than two and a half years later. See In re NYSE Specialists Sec. Litig., 405 F. Supp. 2d 281, 313 (stating that "plaintiffs need only plead circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter") (citing Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994)).

However, certain defendants began their employment at Tower after the allegedly misleading statements, and cannot be held liable for them. See In re LaBranche Sec. Litig., 405 F. Supp. 2d 333, 352 (S.D.N.Y. 2005). The Complaint alleges that defendants Ligocki, Mallak, Hatto joined Tower on July 29, 2003,

Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.") at 15-16). Even if true, the existence of such a strategy does not foreclose the possibility that Tower failed to achieve the synergies of which it boasted in 2000 and 2001. If anything, such a strategy might help explain the alleged lack of cost savings.

22

January 5, 2004, and Spring, 2004, respectively. (Compl. ¶ 22). Thus, no claim is stated with regard to these defendants on the issue of integration.

## ii. **Alleged misstatements and omissions regarding factoring**

Plaintiffs allege that Tower engaged in a factoring program from the beginning of the Class Period until late 2004 whereby the company sold its accounts receivable to a third party intermediary in exchange for discounted, but earlier, payments from the intermediary. (Compl. ¶ 46). Defendants admit that Tower participated in discounted early payment arrangements, but dispute Plaintiffs' characterization of them as factoring programs, instead maintaining that the OEMs administered the early pay system.

Plaintiffs allege that virtually all Tower SEC filings and conference calls during the Class Period misrepresented the company's accounts receivable practices. (See Compl. ¶¶ 107-58). The basis for Plaintiffs' contention that these statements were misleading can be grouped into three distinct categories, and shall be taken up in order: (1) Tower failed to adequately disclose the existence of any sort of early payment program for

23

the majority of the Class Period, and what statements were made omitted the magnitude of the factoring arrangements, the company's level of dependence upon them, and the company's special vulnerability should the programs be terminated; (2) Tower misrepresented the nature of the programs, which were actually factoring arrangements between Tower and a third party, not early payment arrangements between Tower and its automaker customers as Defendants claim; and (3) Tower incorrectly claimed that it had "secured a solution" to replace the discontinued early payment programs in the fall of 2004.

(1) Existence and magnitude of the factoring programs

Defendants argue that Tower amply disclosed its early pay programs in the following filings and analyst calls: 10-Q for period ending 6/30/01; 10-Q for period ending 9/30/01; 2001 10-K; 10/18/02 analyst conference call; and 7/27/04 analyst conference call. In the first four of these statements, Tower referred to its "accelerated collection of receivables" and accounted for such programs' impact on the company's cash flow. In its 2001 10-K filing, Tower specifically noted that "[t]hese programs allow for accelerated collection of receivables from key customers, subject to interest charges ranging from 7.25 percent

24

to 8.5 percent . . . ."  Finally, in the July 27, 2004 conference call, Tower CFO James Mallak stated that "[a]ll of [Tower's] business with Chrysler, Ford, and GM, is on the accelerated program."

The Complaint adequately specifies the basis for Plaintiffs' allegations that Tower misrepresented the existence and magnitude of its early payment arrangements.  The Complaint alleges that Tower did not discuss the magnitude of its accelerated payment programs in any SEC filings between its 2001 10-K and its 10/20/04 8-K filing. (Compl. ¶ 146).  Then-CFO Barone did estimate the size of Tower's early pay arrangements during Tower's 10/18/02 analyst call, but minimized their effects upon the company's cash flow, stating that Tower would be able to offset the approximately $50 million liquidity gain with $35 million to $40 million from its then-existing securitization facility.  Not until nearly two years later did Tower make another statement regarding the increasingly vital early pay arrangements, even refusing to provide such information during an

analyst call on 4/22/03.[5]  Not until its July 27, 2004 analyst call, when CFO Mallak admitted that all of Tower's payments from the big three U.S. automakers were accelerated, did the full extent of the early pay programs become clear.

While it appeared that the actual existence of some sort of early payment programs was not a secret, Tower's long silence on issue is troubling. This problem is compounded by the fact that CEO Ligocki and others specifically identified the termination of these programs in 2004 as at least a contributing factor to Tower's bankruptcy filing.  (Compl. ¶¶ 169-71).  The Court finds that for the foregoing reasons, Plaintiffs allege facts that form a sufficient basis for their contention that Tower's statements and (especially) omissions were misleading under Rule 9(b) and the PSLRA. See Rombach, 355 F.3d at 170.

In contrast to Tower's extensions of time in paying its vendors, discussed *infra*, the company's factoring arrangements had an undisclosed impact upon Tower's liquidity for a large

---

[5] "[Analyst]: And then the accounts receivable acceleration, what's the number for the end of the quarter?

[CEO] Dugald Campbell: We don't - we don't share that information." (4/22/03 Analyst Conference Call, at 4).

26

portion of the Class Period.    Defendants argue that any misleading statements or omissions were immaterial since Tower was ultimately able to obtain a $50 million securitization facility to help offset the effects of the early pay terminations and that it was the OEMs' extended holiday shutdowns that forced Tower into bankruptcy.  The latter contention is one of fact not suitable for resolution at this stage.  Regarding the former, the Complaint alleges that the securitization facility was insufficient to cover Tower's liquidity needs, ultimately contributing to the company's descent into bankruptcy – and contains sufficient facts to support such a claim.  (See Compl. ¶ 168-71).

        The Complaint also sufficiently pleads scienter. Plaintiffs allege that Defendants "knew facts or had access to information suggesting that their public statements were not accurate."  Novak, 216 F.3d at 311 (internal citations omitted). Specifically, a confidential witness who was formerly Executive Vice President of Tower ("CW-4"), stated that the factoring arrangements were Tower's "life blood" and were routinely discussed at Board meetings, which CW-4 attended.  (Compl. ¶¶ 57-60).  Failure to give such a vital contributor to the company's liquidity more than a passing mention in its public statements

27

for a period of years certainly gives rise to an inference of "conscious misbehavior or recklessness," especially where there is no question of defendants' knowledge. Kalnit, 264 F.3d at 138-39.

(2) The nature of the early payment arrangements

Plaintiffs claim that Tower's misrepresentation of its factoring programs rendered its financial reporting inaccurate and the company's statement that "no customer receivables were sold" in the first quarter of 2004 false. (5/10/04 10-Q Statement for Period Ending 3/31/04). Defendants vigorously contest the Complaint's characterization of the programs as "factoring" and dispute the materiality of the allegations.

Though Defendants produce evidence supporting their claim that the programs were administered by the OEMs, it is inappropriate to consider such evidence at this stage. See Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006). Accordingly, the Court has not considered Defendants' exhibits 32, 33, 48, and 49. Furthermore, all factual allegations in the Complaint must be assumed true at this stage of litigation. Chambers v. Time Warner, 282 F.3d at 152. Accordingly, the Court assumes for the

28

purpose of deciding this motion that Tower factored its receivables.

Plaintiffs succeed in establishing a basis for its allegation that Tower misrepresented the nature of its accounts receivable programs. The Complaint again relies on the former Tower Executive Vice President, CW-4, who characterized the practice as factoring. (Compl. ¶¶ 57-58, 60). Additionally, Plaintiffs cite Financial Accounting Standards Board statements supporting their allegation that the factored accounts receivable should have been reported as sales, rather than accelerated remittances from Tower's customers. (Compl. ¶ 148). Both of the foregoing sections provide adequate basis for the allegation of falsity. See Rombach, 355 F.3d at 170.

A Complaint alleging false financial statements "must contain allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture." In re Nokia Ovj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 408 (S.D.N.Y. 2006) (quoting Gavish v. Revlon, Inc., 2004 U.S. Dist. LEXIS 19771 at *16 (S.D.N.Y. Sep. 30, 2004)). Plaintiffs allege that Tower's factored accounts receivable should have been treated as realized sales, but give

29

no hint of the impact such an accounting method would have had on Tower's statements. Similarly, the Complaint ascribes no significance beyond mere falsity to Tower's statement that "no customer receivables were sold" in the first quarter of 2004. Such conclusory allegations, even if true, fail to establish that Tower's categorization of its early pay system and consequent accounting treatment "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." TSC Industries, 426 U.S. at 449 (internal quotation marks omitted).

The Complaint fails to adequately plead scienter as well. Even when Generally Accepted Accounting Procedures ("GAAP") violations are pled, the Complaint fails to state a claim for securities fraud without evidence of fraudulent intent. See Novak, 216 F.3d at 309 (2d Cir. 2000) (citing Chill v. GE, 101 F.3d 263, 270 (2d Cir. 1996)). CW-4's opinion is the only evidence Plaintiffs present supporting their claim on this issue. Simply establishing a basis for the claim that a statement is misleading, as Plaintiffs have done, is insufficient to raise a strong inference of fraudulent intent. See Kalnit, 264 F.3d at 143. The Complaint points to no specific facts or documents supporting the notion that Defendants recklessly mischaracterized

30

the nature to the early payment arrangments.  Cf. <u>San Leandro</u>
<u>Emergency Medical Group</u>, 75 F.3d at 812 (holding that
"[p]laintiffs' unsupported general claim of the existence of
confidential company sales reports that revealed the larger
decline in sales is insufficient to survive a motion to
dismiss.").  Neither does the Complaint betray any evidence to
support motive and opportunity to commit fraud, deliberately
illegal behavior by any Defendant, nor failure to check
information which Defendants had a duty to monitor.  See <u>Novak</u>,
216 F.3d at 311.


        (3) Tower's claim that it had "secured a solution"


        Tower's October 20, 2004 8-K filing stated that "Tower
Automotive has secured a solution to offset the one time
liquidity impact of the [early payment] plan termination.  A term
sheet has been negotiated and due diligence has been completed."
(10/20/04 8-K Statement).[6]  Plaintiffs allege that this statement
was misleading because it erroneously led investors to believe
that the company had solved its liquidity problems when in fact
Tower had not yet secured additional credit and even the

---

[6] Plaintiffs' allegation that the same filing misrepresented the
Tower's factoring program is addressed _supra_.

additional securitization that Tower ultimately obtained was insufficient to offset the negative impact to the company's liquidity caused by the end of early payment programs. (Compl. ¶¶ 146-47). Plaintiffs allege that subsequent Tower statements leading up to its bankruptcy filing were misleading for effectively the same reasons. (Compl. ¶¶ 149-58). Defendants maintain that these disclosures were not misleading because they stated that Tower was merely pursuing a solution and were forward-looking.

The Complaint adequately sets out the basis for the falsity of Tower's October 20, 2004 8-K filing. Defendants accurately note that the filing also stated that Tower was "pursuing a securitization of its accounts receivable" and "in the process of requesting an amendment to" its existing credit facility, which permitted securitization only up to $50 million. (10/20/04 8-K Statement). Further confusing the issue, the statement that Tower had "secured a solution" is drawn from a PowerPoint presentation prepared by Tower, denominated "Senior Secured Credit Facility Amendment Request," and annexed to the filing as an attachment. Defendants' explanation that a reasonable investor would read the document as a whole to mean that Tower was still searching for a 'solution' is plausible.

32

From a literal reading of the document, however, Plaintiffs'
theory is also plausible. Subsequent Tower filings and
statements provide a more than adequate basis for finding that
Tower had in fact not yet secured a solution to its liquidity
problem. (See Compl. ¶¶ 149-58).

Plaintiffs also sufficiently allege materiality with
regard to the October 20, 2004 8-K. Even if the holiday shutdown
was the straw that broke Tower's back (as Defendants assert),
Tower's statements both before and after its bankruptcy make
manifest the fact that the company's liquidity position was in a
perilous state. "Thus, it was clear from these disclosures that
another multi-million dollar loss of liquidity could put Tower's
solvency in jeopardy." (Defendants' Reply Brief in Support of
Motion to Dismiss, at 10). A revelation that Tower had "secured
a solution to offset the one time liquidity impact of the [early
payment] plan termination" would quite clearly be material.

The Complaint adequately alleges that Defendants had
access to facts contrary to the alleged statement. (See Compl.
¶¶ 149-56 (indicating that Tower was still searching for a
solution)). Plaintiffs have thus sufficiently pleaded scienter.
See Novak, 216 F.3d at 311.

33

According to the Complaint, defendants Campbell, Thomas, Rued, and Barone all left the employ of Tower prior to the October 20, 2004 filing. Thus, no claim for securities fraud is stated against them for the above statement.

Plaintiffs' allegations concerning Tower's subsequent disclosures fall short, however. Plaintiffs allege that Tower's 10/28/04 conference call, statements reported in the 11/8/04 issue of Crain's *Detroit Business*, the company's 9/30/04 10-Q, its 12/6/04 8-K, and its 1/4/05 press release were misleading because they failed to state that its liquidity crisis would lead to Tower's bankruptcy. (Compl. ¶¶ 149-57). So long as Tower disclosed those "material facts reasonably available to them," the law requires no more. Novak, 216 F.3d at 309. "Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." Id. Tower's statements during this period made clear that the company was in financial distress and seeking immediate assistance to compensate for its lost cash flow. Tower's January 4, 2005 press release indicated that Tower ultimately secured a $50 million accounts receivable securitization, but also made clear that this

34

was only a partial solution and that the company sought
additional cash flow offsets.

### iii. Alleged misstatements and omissions regarding vendor payments/accounts payable

Plaintiffs also allege that Tower's disclosures
regarding its payments to vendors were incomplete and misleading.
As support, Plaintiffs offer anecdotal statements of at least ten
confidential witnesses describing Tower's accounts payable
practices. (Compl. ¶¶ 69-92). For the purposes of deciding the
present motion, Plaintiffs' allegations are presumed to be true.
At one point, the vast majority of Tower's spare part suppliers
placed Tower on "credit hold," and some vendors were not paid
unless they specifically threatened to cut off shipments.
(Compl. ¶¶ 80, 92). The directive to delay payments "was a
corporate decision," according to one witness. (Compl. ¶ 92; see
also Compl. ¶¶ 85-86).

Against this backdrop, Plaintiffs argue that the
disclosures were insufficient because they did not reflect the
depth of the vendor payment and liquidity problems.
Specifically, Plaintiffs allege that Tower's 10-K filings for the

35

years 2001 through 2003 inadequately disclosed the dire state of
its accounts payable and liquidity position. (Compl. ¶¶69, 164).
In each of these filings, Tower stated that it had embarked upon
"extending its accounts payable terms to coincide with prevailing
industry practices . . . ." (3/25/02 10-K Statement for 2001, at
20; Compl. ¶ 164). Plaintiffs assert that these statements were
fraudulent because the actual motivation for the delays in paying
vendors was "due to its liquidity problems and lack of cash . . .
." (Compl. ¶ 164).

     Had Tower's statements on the subject of vendor
payments been limited to the single-sentence disclosure cited in
the Complaint, Plaintiffs would succeed in establishing a
sufficient basis for the claim of falsity. However, Tower's
filings and public pronouncements on the issue were far more
extensive. Defendants note the following additional Tower
filings and statements, which this Court may consider under
Faulkner v. Beer, 463 F.3d at 134.

     1. A July 19, 2001 conference call with analysts where then-
     CFO Barone stated that "the extension of accounts payable
     spending terms" affected Tower's reported "cap[ital]

36

ex[penditures]" figure.    (7/19/01 Analyst Conference Call,
at 19-20).

2. Attached to its February 14, 2003 8-K, a PowerPoint slide
showing Tower's accounts payable increasing from $248
million on 12/31/00 to $369 million on 12/31/01 to $418
million on 12/31/02, and its days payable[7] increasing from
42 days on 12/31/00 to 61 days on both 12/31/01 and
12/31/02.  (2/14/03 8-K Statement, at slide 8).

3. Attached to its April 22, 2003 8-K, a PowerPoint slide
showing accounts payable increasing to $461.9 million and
days payable increasing to 63 as of 3/31/03.  (4/22/03 8-K
Statement, at slide 7).

4. Attached to its July 22, 2003 8-K, a PowerPoint slide
showing accounts payable increasing to $572.0 million and
days payable increasing to 77 as of 6/30/03.  (7/22/03 8-K
Statement, at slide 10).

---

The days payable figure represents the average numbers of
days vendors waited for payment weighted by the amount due.

5. A July 22, 2003 conference call where CFO Thomas stated that "in accounts payable, there's roughly \$138 million of tooling.[8] If you pull that out, [days payable] will [be] 58 days compared to 57 days in the year earlier period." (7/22/03 Analyst Conference Call, at 5).

6. Attached to its February 22, 2004 8-K, a PowerPoint slide showing trade accounts payable increasing from \$406.6 million on 12/31/02 to \$411.6 million on 9/30/03 to \$459.8 million on 12/31/03, its trade accounts days payable increasing from 60 days on 12/31/02 to 63 days on 9/30/03 and 64 days on 12/31/03, and its tooling accounts payable increasing from \$11.1 million on 12/31/02 to \$172.2 million on 9/30/03 and decreasing to \$96.2 million on 12/31/03. (2/22/04 8-K Statement, at slide 12).

7. Attached to its October 28, 2004 8-K, a PowerPoint slide showing trade accounts payable increasing from \$548.7 million on 6/30/04 to \$571.1 million on 9/30/04, its trade

---
[8]

For this and all subsequent statements, Tower broke out its accounts payable figure into two categories: tooling accounts payable and trade accounts payable. (Def. Mem. at 47). Tower did not subsequently disclose its days payable for tooling accounts.

accounts days payable increasing from 69 days on 6/30/04 to 74 days on 9/30/04, and its tooling accounts payable decreasing from $98.3 million on 6/30/04 to $97.4 million on 9/30/04.  (10/28/04 8-K Statement, at slide 23).

8.  In every 10-Q filed during the Class Period, the disclosure of its total accounts payable, which reflects the following figures: $248.4 million (12/31/00); $290.0 million (3/31/01); $360.9 million (6/30/01); $352.5 million (9/30/01); $368.9 million (12/31/01); $386.0 million (3/31/02); $419.5 million (6/30/02); $402.9 million (9/30/02); $417.7 million (12/31/02); $461.9 million (3/31/03); $572.0 million (6/30/03); $583.8 million (9/30/03); $556.0 million (12/31/03); $579.3 million (3/31/04); $647.0 million (6/30/04); $668.5 million (9/30/04).  (Tower 10-Q filings).

In fact, Tower's statements on the issue of vendor payments accurately reflected its increasing reliance upon extending accounts payable in order to bolster its cash flow. Starting with its 8-K filed on February 14, 2003, Tower disclosed both its accounts payable amount and its days payable, which more precisely apprised investors the effect of its vendor payment

39

practices upon its balance sheet. Though voluminous and detailed, Plaintiffs' allegations actually tend to *reinforce* the picture painted by Tower's filings. When Tower extended its vendor payment periods in 2001, its accounts payable rose accordingly. (See Compl. ¶ 70). As problems paying vendors became more serious in 2003, Tower began reporting the days payable figure, which – along with the accounts payable figure – consistently climbed from the end of 2002 until the company's bankruptcy filing. (See Compl. ¶¶ 77-88).[9] When the facts pleaded in a securities fraud complaint corroborate defendants' statements rather than rendering them misleading, the complaint must fail under Rule 9(b) and the PSRLA. See Novak, 216 F.3d at 309. Here, Plaintiffs fail to meet their burden to plead facts which explain how Tower's statements and omissions regarding vendor payments were misleading. See Rombach, 355 F.3d at 170.

---

Of course, by the very nature of the fact that Tower's reported days payable figures represent an average, outliers will exist. (See, e.g., Compl. ¶ 79 (alleging that some office supply and maintenance, repairable, and operational vendors were paid up to six months late)). A corporation need not disclose every individual datum that makes up its financials, however. Unless omission would be misleading, it need only report an accurate summary of such information. See TSC Industries, 426 U.S. at 448-49.

Furthermore, Plaintiffs also fail to state a claim on the vendor payment issue under 10-b(5) because the alleged misrepresentations are not material.  See Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (quoting Levitin v. Painewebber, Inc., 159 F.3d 698, 702 (2d Cir. 1998)).  While materiality is generally an issue for the trier of fact, it may be resolved on a motion to dismiss if no "reasonable investor would have considered [the omission] significant in making investment decisions."  Ganino, 228 F.3d at 162.  Here, there appear to be two possible routes to demonstrating materiality.  First, Plaintiffs could allege facts showing that the late vendor payments materially affected Tower's ability to conduct its business.  See, e.g., In Re Stone and Webster Inc., Sec. Litig., 414 F.3d 187, 206-07 (1st Cir. 2005) (noting that vendor payments as late as 600-700 days led the defendant corporation to abruptly halt construction at one site and creditors to place liens on other sites).  Alternatively, Plaintiffs could proceed on the theory that late vendor payments were merely symptomatic of a larger liquidity crisis which was inadequately disclosed.

Plaintiffs allege no facts tending to show that Tower's operations were materially affected by its late payments. Plaintiffs identify only one shipment delay of "a day or two" to

41

one plant by one supplier, and do not allege that the delay affected production at all. (Compl. ¶ 78). Such allegations surely do not "significantly alter[] the total mix" of information available to investors. DeMaria v. Andersen, 618 F.3d 170, 180 (2d Cir. 2003) (quoting TSC Industries, 426 U.S. at 449).

Plaintiffs' allegations fall more readily under the liquidity crisis theory of materiality. However, the burgeoning crisis in 2003 and 2004 mirrored the rise in days and accounts payable dutifully reported by Tower beginning in February, 2003. (See 2/14/03 8-K Statement). Any investor could have examined Tower's accounts payable and receivable figures to see that Tower's liquidity problem was growing. See Ganino, 228 F.3d at 162 ("An omitted fact may be immaterial if the information is trivial or is so basic that any investor could be expected to know it") (internal citations omitted). Since the Complaint presents no allegations that Tower's actual disclosures were false, Plaintiffs must plead facts sufficient to support the notion that the non-disclosure of at least some of the facts in the Complaint were material with regard to Tower's liquidity position. See Rombach, 355 F.3d at 173-74; In re Pacific Gateway Exhange, Inc., Sec. Litig., 2002 U.S. Dist. LEXIS 8014 at *50-*51

(N.D. Cal. Apr. 30, 2002); cf. Stone & Webster, 414 F.3d at 206
(noting that plaintiffs alleged that corporate disclosures
themselves were untruthful; "the quarterlies . . . just did not
jibe" with reality). However, taken together and assumed true,
the allegations fail to establish such an inference. "As long as
the public statements are consistent with reasonably available
data, corporate officials need not present an overly gloomy or
cautious picture of current performance and future prospects."
Novak, 216 F.3d at 309. To the extent the Complaint presents any
discernable misrepresentation, Plaintiffs' pleadings are limited
to only a fraction of Tower's more than fifty plants worldwide
and merely add detail to Tower's contemporaneous public
disclosures. Plaintiffs have failed to plead facts sufficient to
maintain an inference that Tower's statements or omissions were
materially misleading.

The Complaint also insufficiently pleads scienter.
While Plaintiffs allege that the delays plaguing Tower's accounts
payable were at least known to Defendants (notably Campbell and
Barone), for reasons discussed above, none of Tower's statements
on the subject were materially misleading. (Compl. ¶¶ 59, 70,
82, 86, 92). Thus, the Complaint fails to allege conscious

43

misbehavior or recklessness with regard to Tower's statements on
its payments to vendors. See Kalnit, 264 F.3d at 142-43; Novak ,
216 F.3d at 309 (stating Second Circuit rule that where "public
statements are consistent with reasonably available data"
recklessness is not sufficiently pled).

## iv.  Alleged misstatements and omissions regarding long-term contracts

Plaintiffs allege that Tower failed to disclose that it
was "locked into contracts that lasted from three to ten years
and *mandated* regular price decreases." (Compl. ¶ 63) (emphasis
Plaintiffs').  Plaintiffs support this claim by offering: a
portion of Tower's bankruptcy filing indicating that "[i]n many
cases, long-term supply contracts with the Company's customers
call for regular price decreases"; a statement from the former
Vice President of Finance that Tower "had no way of knowing what
pricing demands the OEMs would make on [its] existing and future
contracts"; statements by a former Executive Vice President and
former Business Unit Leader that Tower's long-term supply
contracts required annual 3%-5% price reductions; and a statement
from the former Director of Sales and Engineering for the Ford

44

Account that Tower had to give up some existing benefit in order
to get new business from OEMs.  (Compl. ¶¶ 64-68).

Tower's public statements regarding its long-term
contracts focused not on their declining-price nature, but rather
on the fact that Tower lost money on some of its contracts:

> The company is committed under certain existing
> agreements, assumed in connection with prior
> acquisitions, to supply product to its customers at
> selling prices that are not sufficient to cover the
> direct costs to produce these parts.  The Company is
> obligated to supply these products for the life of the
> related vehicles, which is typically three to ten
> years.   (3/25/02 10-K405 Statement for 2001, at 30;
> 3/19/03 10-K Statement for 2002, at 31; 3/8/04 10-K
> Statement for 2003, at 29).

Each 10-K also stated the dollar amount Tower placed in
reserve to cover losses on these contracts.  (See 3/25/02 10-K405
Statement for 2001, at 59; 3/19/03 10-K Statement for 2002, at
31-32, 66; 3/8/04 10-K Statement for 2003, at 29-30, 64-65).

Tower, however, also made disclosures regarding the
declining nature of its contracts.   In November, 1998, Tower
noted that:

45

Certain of the Company's products are sold under long-term agreements that require the Company to provide annual cost reductions to such purchasers (directly through price reductions or indirectly through suggestions regarding manufacturing efficiencies or other cost savings) by certain percentages each year. There can be no assurance that the Company will be able to generate such cost savings in the future. If the Company were unable to generate sufficient production cost savings in the future to offset such price reductions, the Company's gross margin could be adversely affected. (11/10/98 S-3/A Statement, at 14).

During the Class Period, most of Tower's disclosures on this issue were far more general. Each 10-K issued during the Class Period included the following statement:

There is substantial continuing pressure from the major OEMs to reduce costs, including the cost of products purchased from outside suppliers. In addition, the Company's profitability is dependent, in part, on its ability to spread fixed production costs over increasing product sales. If the Company is unable to generate sufficient production cost savings in the future to offset price reductions and any reduction in consumer demand for automobiles resulting in decreased sales, the Company's gross margin and profitability would be adversely affected. (3/25/02 10-K405 Statement for 2001, at 33; 3/19/03 l0-K Statement for 2002, at 26; 3/8/04 10-K Statement for 2003, at 35)

46

Plaintiffs' contention that the above disclosures were misleading relies primarily on the assertion that Tower admitted only that some contracts would lose money, while failing to disclose that "many" contracts required declining payments from OEMs. (Compl. ¶¶ 159-60). There are really two elements to this argument: First, Tower failed to indicate the declining nature of its long-term supply contracts with OEMs (at least after its November 10, 1998 filing); Second, Tower did not adequately specify the quantity of such contracts (either in dollar terms or in the number of contracts).

Plaintiffs have adequately specified the basis for these twin contentions under Rule 9(b) and the PSLRA. While Tower did explicitly acknowledge the declining nature of at least some of its OEM contracts in its November 10, 1998 S-3/A filing, subsequent filings were more oblique and spoke only of general cost pressures. Further, no public statements identified by either party specify the quantity of these declining-price contracts.

By framing this contention so narrowly, however, Plaintiffs have created a materiality problem. Defendants argue

47

that the alleged misrepresentations are immaterial in light of the fact that the existence and financial impact of Tower's loss contracts (i.e., contracts where Tower expected to lose money) was disclosed. Materiality can properly be evaluated only in the context of the total mix of information, and it is thus appropriate to consider whether Tower's disclosure of its loss contracts obviated any need to more fully discuss its declining-price contracts. An investor would surely be more concerned with the former type, since Tower could well have turned profits on its declining-price contracts.

More importantly, the Complaint fails to provide any meaningful statement about the magnitude of Tower's declining-price contracts or their effects upon the company and its financials. The Complaint alleges that there were "many" such contracts which required Tower to "lay out a lot of capital . . . ." (Compl. ¶¶ 66, 161). Such vague assertions provide no basis for determining the significance of Tower's alleged misrepresentations. See NTL, 347 F. Supp. 2d at 24-25; Stone & Webster, 414 F.3d at 200. The Complaint's failure to provide any yardstick by which to measure the significance of these omissions

to a multi-billion dollar corporation such as Tower is fatal to its claims on this issue.

Here, Plaintiffs' allegations fail to establish any basis for scienter.    The strong inference of fraudulent intent "may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."    Novak, 216 F.3d at 311 (internal citations omitted).

While the Complaint sufficiently alleges knowledge of Tower's contracts on the part of Defendants, it lacks anything more than conclusory allegations that Defendants knew or should have known that Tower's statements on the subject were inaccurate.    (Compl. ¶¶ 57-60, 79, 82); see Rombach, 355 F.3d at 176 (dismissing claim for lack of scienter where "[p]laintiffs do not allege facts and circumstances that would support an inference that Defendants knew of specific facts that are contrary to their public statements.").    In fact, Tower disclosed

49

that certain of its long term contracts would result in net losses and quantified those losses. (3/25/02 10-K405 Statement for 2001, at 30; 3/19/03 10-K Statement for 2002, at 31; 3/8/04 10-K Statement for 2003, at 29). Tower also stated that OEMs exerted "substantial continuing pressure" on Tower to reduce its prices. (3/25/02 10-K405 Statement for 2001, at 33; 3/19/03 10-K Statement for 2002, at 26; 3/8/04 10-K Statement for 2003, at 35). While Plaintiffs narrowly succeeded in establishing a basis that these statements were misleading, they have failed to plead facts that establish any inference -- let alone a strong one -- that any defendants possessed fraudulent intent in making them.

## v. **Alleged misstatements and omissions regarding bankruptcy planning**

Finally, Defendants move to dismiss Plaintiffs' claims of fraud based upon Tower's alleged bankruptcy planning. Plaintiffs base their allegations on CEO Kathleen Ligocki's deposition testimony that the company was working on "contingency plans" as early as October 2004, three months before Tower's actual bankruptcy filing. (Ligocki Deposition Transcript, at 26). Later in the deposition, Ms. Ligocki appears to equate her

50

term "contingency plan" with the bankruptcy filing.[10]   While Defendants dispute Plaintiffs' interpretation, the Court will assume *arguendo* that Ms. Ligocki admitted that Tower's bankruptcy planning began in October of 2004.   Plaintiffs argue that the very fact that Tower was making contingency plans for bankruptcy rendered misleading its subsequent public statements, since these statements did not mention bankruptcy planning.

This claim must fail because Tower's failure to disclose its bankruptcy planning did not make its other disclosures misleading.   See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).   Tower's statements from October, 2004 to January, 2005 indicated that it was pursuing options for easing the company's liquidity problems, including pursuing (and

---

Q: Do you know how much time Mr. Hatto [Tower's controller] spends on the bankruptcy?

[Ms. Ligocki]: Yes, approximately 50 percent of his time.

Q: And how long has that been true?

[Ms. Ligocki]: I would say since -- at least since January of this year, the month before we were filing with the contingency plan and clearly since the filing on February 2nd.

(Ligocki Deposition Transcript, at 28-29).

later obtaining) an accounts receivable securitization facility and deferring a dividend payment. (See 10/28/04 Analyst Conference Call; 12/6/04 8-K Statement; Press Release, Tower Automotive Investor Relations, "Tower Automotive Obtains \$50 Million Accounts Receivable Securitization Facility," (Jan. 4, 2005) (available at: http://www.towerautomotive.com/releases/ 2005/010405.htm); Press Release, Tower Automotive Investor Relations, "Tower Automotive Announces Update on Liquidity," (Jan. 20, 2005) (available at: http://www.towerautomotive.com/ releases/2005/012005.htm)). Because Tower disclosed its intensive efforts to ameliorate the company's liquidity problem, the lack of disclosure regarding its bankruptcy planning did not transform its disclosures during this period into misrepresentations. See Time Warner, 9 F.3d 259 at 267; Keeney v. Larkin, 306 F. Supp. 2d 522, 539-40 (D. Md. 2003) (dismissing securities fraud claim alleging failure to disclose bankruptcy planning activities when defendants had disclosed efforts at obtaining credit). For these reasons, Plaintiffs have failed to meet their burden under Rule 9(b) and the PSLRA to explain the basis for their allegation that the above statements were misleading.

The claim also fails to adequately plead scienter under Rule 10-b(5). No multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action, and Tower was apparently no exception to this rule. However, "in the absence of any factual allegations from which one can infer that defendants had actually settled upon the details" of the bankruptcy plan in advance of the filing, Plaintiffs' allegations fail to evince any hint of fraudulent intent. <u>Fant v. Perelman</u>, 1999 U.S. Dist. LEXIS 5694 at *45 (S.D.N.Y. Apr. 9, 1999); <u>see</u> <u>also</u> <u>Novak</u>, 216 F.3d at 307.

## vi. **Loss Causation Allegations**

To survive a motion to dismiss, the complaint must adequately allege that the company's misrepresentation was the cause of Plaintiffs' economic loss (loss causation). <u>See</u> <u>Dura</u>, 544 U.S. 336. The <u>Dura</u> Court assumed *arguendo* that the notice pleading standards of Rule 8 govern the pleading of loss causation, and nearly all courts addressing the issue since have also applied Rule 8, rather than the heightened pleading standard of Rule 9. <u>See</u> <u>NYSE Specialists</u>, 405 F. Supp. 2d at 315. Thus,

Plaintiffs need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.

Here, Plaintiffs have more than met their burden with regard to all claims under Count One. Plaintiffs identify six distinct corrective disclosures and specify the immediate negative impact of each upon Tower's stock price. (Compl. ¶ 183). Plaintiffs also tie the identified disclosures to each of the five claims Count One comprises. (Compl. ¶¶ 183-84). This amply satisfies the requirement that Defendants be provided "with some indication of the loss and the causal connection that the plaintiff[s have] in mind." Dura, 544 U.S. at 347.

## II. Count Two: Plaintiffs' 10b-5 (a) & (c) Allegations

Plaintiffs allege that defendants Johnson, Rued, Hidden Creek and J2R ("the Hidden Creek Defendants") violated Exchange Act § 10(b) as promulgated by Rules 10b-5(a) and (c) by: (1) taking Tower public; (2) directing Tower's numerous acquisitions (and receiving fees on these acquisitions); (3) knowing or

54

recklessly ignoring that Tower had failed to integrate its acquisitions, labored under numerous loss contracts, and suffered severe liquidity problems; (4) selling all their Tower stock holdings in 1996 and 1997; (5) receiving undeserved fees and payments from Tower during the class period; and (6) causing Tower to invest approximately \$44 million in a company, J.L. French ("French"), in which the Hidden Creek Defendants had a substantial interest and which was ultimately written off as a total loss. (Compl. ¶ 216; Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss ("Pl. Mem."), at 64).

"To state a claim based on conduct that violates Rule 10b-5(a) and (c), the plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries."   In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005). The pleading standards of Rule 9(b) and the PSLRA discussed *supra*, govern claims under Rule 10b-5(a) and (c).   See id. at 491.

55

Defendants contend that the claim is time-barred and fails to allege a deceptive device, scienter, or loss causation.

Under Section 804 of the Public Company Accounting Reform and Investor Protection Act of 2002, the statute of limitations for a securities fraud claim is longer of two years from the date of discovery or five years from the date of occurrence.  See Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (2002) codified in part at 28 U.S.C. § 1658(b); Aetna Life Ins. Co. v. Enter. Mortg. Acceptance Co., LLC (In re Enter. Mortg. Acceptance Co., LLC Sec. Litig.), 391 F.3d 401, 403 (2d Cir. 2004).  "[S]urvival of a Rule 12(b)(6) motion to dismiss on statute of limitations grounds requires only allegations consistent with a claim that would not be time-barred."  Harris v. City of New York, 186 F.3d 243, 251 (2d Cir. 1999).  The Complaint was filed on September 30, 2005, and alleges that the deceptive scheme continued into late in the class period, well within the minimum five year statute of limitations.  (See Compl. ¶¶ 7, 35, 50, 105, 175, 177, 179, 216).

In  Parmalat,  the  court  found  that  allegations "involving the regular factoring and securitization of worthless

56

invoices" stated a claim where the complaint alleged that the arrangements "were in fact a trick to disguise" their true purpose as a loan. 376 F. Supp. 2d at 504. In contrast, claims regarding Defendants' mischaracterization of debt failed to state a claim because the "transactions were not shams" and "there [was] no suggestion that the transactions were something other than what they appeared to be." Id. at 505.

Of the six 'deceptive acts' identified by Plaintiffs, none but the purported investment in French is supported by even conclusory allegations.[11] Plaintiffs allege that Tower's investments in French were disguised gifts to the Hidden Creek Defendants. If pleaded sufficiently, such an allegation -- analogous to the sham loan in Parmalat -- would state a claim under 10b-5(a) and (c). See id. at 504. However, the Complaint provides no basis for its averment that the investment was a de facto gift, save for the facts that defendant Rued acknowledged that "French had problems after its 1999 acquisition of Nelson Metal Products Corp." and that Tower ultimately wrote off the

_____

[11]That is, there are no facts alleged in the Complaint to support the notion that any of the first five of the Hidden Creek Defendants' supposedly deceptive acts was a ruse to disguise its true purpose, unless one considers putting quotes around the word "fees" to connote that they were not earned. (Compl. ¶ 175).

57

entire investment. (Compl. ¶¶ 26, 176, 179). Such allegations insufficiently establish a basis for the claim or that the Hidden Creek Defendants acted with the requisite state of mind. Unlike in Parmalat, no facts are pleaded to show that the French investments were worthless at the time they were made. That French had some "problems" of unspecified nature around the time that Tower funded it fails to raise an inference that the investments were shams. That the investment eventually came to naught, while perhaps necessary for the claim, is not sufficient to provide a basis for alleging fraud or recklessness. See Novak, 216 F.3d at 306-07; Parmalat, 376 F. Supp. 2d at 504.

## III. Count Three: Plaintiffs' Section 20(a) Allegations

Plaintiffs allege that all defendants except J2R are liable as under § 20 of the Exchange Act as controlling persons. 15 U.S.C. § 78t(a). "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d

58

Cir. 1998) (quoting <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472 (2d Cir. 1996), cert. denied, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997)) (internal quotation marks omitted); <u>Deutsche Telekom AG Sec. Litig.</u>, 2002 U.S. Dist. LEXIS 2627, at *7 (S.D.N.Y. Feb. 20, 2002) (applying "culpable participation" requirement at pleading stage); <u>In re Emex Corp. Sec. Litig.</u>, 2002 U.S. Dist. LEXIS 17528, at *9 (S.D.N.Y. Sept. 18, 2002) (same).

In order to plead control person liability under Section 20(a), a plaintiff must "allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud." <u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>, 250 F.3d 87, 101 (2d Cir. 2001) (holding that plaintiffs had stated a Section 20(a) claim against defendant bank where it was alleged that: (1) the person who had committed the alleged violation of Section 10(b) was an officer of the bank, and (2) the officer was responsible for the bank's relationship with a venture whose securities were the subject of the alleged Section 10(b) violation). Section 20(a) violations are governed by Rule 8's pleading standard. <u>See In re Van Der Moolen Holding N.V. Sec.</u>

Litig., 405 F. Supp. 2d 388, 413 (S.D.N.Y. 2005) (citing In re WorldCom, Inc. Sec. Litig. 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003)).

The Complaint identifies Tower as the controlled person and alleges that Defendants exerted their control by virtue of their positions as senior executives and/or members of Tower's board. (Compl. ¶ 226). Defendants contend that the Complaint fails to allege a primary violation by Tower or culpable participation by any defendant and thus moves to dismiss this count in its entirety. Defendants' arguments are unavailing.

The Complaint is rife with allegations of securities fraud and specifically attributes these violations to Tower. (Compl. ¶ 182 ("Tower hid its true financial condition, lack of liquidity and exposure to bankruptcy..."); Compl. ¶ 226 (Defendants "caused Tower to engage in the wrongful conduct complained of herein")); compare In re Exodus Comms., Inc. Secs. Litig., 2005 U.S. Dist. LEXIS 20222 at *142 (N. D. Cal. Aug. 5, 2005) (dismissing § 20(a) claim where "there are no allegations that the acts of the Individual Defendants are attributable to Exodus, nor is there any allegation that Exodus otherwise

60

committed violations of the securities laws"). Moreover, Plaintiffs are not precluded from pleading that Defendants are both primary violators and control persons. See Van Der Moolen, 405 F. Supp. 2d at 413.

Similarly, Plaintiffs adequately allege culpable participation by Defendants under the requisite pleading standard. "[T]he concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a). At the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard." WorldCom, 294 F. Supp. 2d at 415. Plaintiffs' assertion that Defendants exerted control by virtue of their senior positions within the company combined with the scienter allegations scattered throughout the Complaint meet the bar required by Rule 8's notice pleading standard. See Suez Equity Investors, 250 F.3d at 101-02; Van Der Moolen, 405 F. Supp. 2d at 413.

## Conclusion

As set forth above, Defendants' motion to dismiss the Complaint is granted in part and denied in part.

As to Count One, Defendants' motion to dismiss is granted in part and denied in part.  With respect to claims regarding Tower's payments to its vendors, its long-term contracts with OEMs, and its bankruptcy planning, the motion to dismiss is granted.  With respect to statements regarding Tower's integration of its acquisitions, the motion is granted only as to defendants Ligocki, Mallak, and Hatto.  With respect to Tower's early payment programs, the motion is denied.

As to Count Two, Defendants' motion to dismiss is granted.

As to Count Three, Defendants' motion to dismiss is denied.

It is so ordered.

New York, NY

April /4, 2007

Robert W. Sweet, U.S.D.J.

62